UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
STATE OF NEW YORK, and BASIL SEGGOS,
COMMISSIONER OF THE NEW YORK STATE
DEPARTMENT OF ENVIRONMENTAL
CONSERVATION,

      Plaintiffs,

                - against -

STEVEN LEVEY, in his representative capacity as
administrator of the Estate of Irving Levey, and in his
individual capacity as distributee of the Estate of Irving
Levey,

      Defendant.

------------------------------------------------------------------- x

**CASE NO. 17-6739**

**COMPLAINT**

Plaintiffs the State of New York (the "State") and Basil Seggos ("Seggos"), in his capacity as Commissioner of the New York State Department of Environmental Conservation ("DEC"), by their attorney Eric T. Schneiderman, Attorney General of the State of New York, as and for their Complaint, allege as follows, upon information and belief:

## NATURE OF THE ACTION

1. This is an action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 ("CERCLA"), as amended, to recover costs that have been and will be incurred by the State in responding to the release of hazardous substances into the environment at and from the premises located at 1305 South Strong Avenue, Copiague, New York (the "Site").

2. This action seeks recovery of: (a) the State's response costs incurred to date; and (b) a declaration of liability for the State's future response costs.

## JURISDICTION AND VENUE

3. This Court has exclusive jurisdiction over the First Claim for Relief, which arises under the laws of the United States, pursuant to 28 U.S.C. §§ 1331 and 2201 and 42 U.S.C. §§ 9607 and 9613. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Second Claim for Relief, which is based upon New York common law and arises out of a common nucleus of operative facts shared with the First Claim for Relief. The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

4. Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the release of hazardous substances that gives rise to this action occurred within this District and the Site is located within this District.

## THE PARTIES

5. Plaintiff the State of New York brings this action to recover costs that have been and will be incurred by the State in responding to the release of hazardous substances at and from the Site.

6. Plaintiff Basil Seggos is the Commissioner of the New York State Department of Environmental Conservation. Commissioner Seggos brings this action in his official capacity to recover costs that have been incurred by DEC in responding to the release of hazardous substances at and from the Site.

7. Defendant Steven Levey is the administrator and a distributee of the estate of Irving Levey (the "Levey Estate"). He is being sued in his representative capacity as the administrator of the Levey Estate and in his individual capacity as a distributee of the Levey Estate.

## STATUTORY AND REGULATORY BACKGROUND

**CERCLA**

8. CERCLA provides that, when there is a release of hazardous substances into the environment from a facility, certain categories of persons are liable to the State for the costs that the State incurs to respond to the release as long as the State's response actions are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

9. "Hazardous substances" are defined in 42 U.S.C. § 9601(14) to include substances that the U.S. Environmental Protection Agency ("EPA") has designated as hazardous pursuant to 42 U.S.C. § 9602. The substances that EPA has designated as hazardous are listed in 40 C.F.R. § 302.4.

10. A "release" includes spilling, leaching, and disposing "into the environment." *Id.* § 9601(22). The "environment" includes groundwater, land surface, and subsurface strata. *Id.* § 9601(8).

11. A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C.§ 9601(9). It also includes buildings, structures, and equipment. *Id.*

12. The term "respond" includes taking "removal" actions, "remedial" actions, and related enforcement activities. *Id.* § 9601(25). A "removal" action includes the "cleanup or removal of released hazardous substances from the environment" as well as the assessment and evaluation of a release. *Id.* § 9601(23). A "remedial" action means "those actions consistent with permanent remedy taken instead of or in addition to removal actions." *Id.* § 9601(24).

13. The "national contingency plan" is set forth in 40 C.F.R. Part 300.

14. The persons liable for response costs under 42 U.S.C. § 9607(a) include: (i) current owners and operators of a facility; and (ii) owners and operators of a facility at the time of disposal of hazardous substances. "Persons" includes individuals and corporations. 42 U.S.C. § 9601(21).

15. 42 U.S.C. § 9613(g)(2) provides that in an action for response costs under CERCLA, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding in any subsequent action or actions to recover further response costs or damages."

**New York Public Nuisance Law**

16. Plaintiffs' Second Claim for Relief is based on New York common law and New York Real Property Actions and Proceeding Law § 841, and seeks to recover funds that the State has spent and will spend abating the public nuisance resulting from contamination at the Site.

17. A public nuisance is a condition that offends, interferes with, or causes damage to the public in the exercise of rights common to all, in a manner such as to, among other things, endanger or injure the property, health, safety, or comfort of a considerable number of persons.

18. Persons who cause or contribute to the creation or maintenance of a public nuisance are strictly, and jointly and severally, liable for its abatement.

## FACTUAL ALLEGATIONS

**The Site**

19. The Site is located at 1305 South Strong Avenue, Copiague, Town of Babylon, Suffolk County, New York, and identified on the Suffolk County tax map as District 100, Section 198, Block 2, Lot 29. The Site is bounded by Chettic Avenue to the north, South Strong Avenue to the east, and Victoria Avenue to the south.

20. The Site occupies approximately 1.03 acres that are partially concrete-paved, partially unpaved, and partially vegetated, with an approximately 20,000-square foot building bisecting the property from east to west. The surrounding area is suburban, with residential properties adjacent to the east and south, and industrial/commercial properties adjacent to the north and west. The Site is currently vacant.

21. From approximately 1951 to 1990, the Site's sanitation system discharged into on-site underground structures, including cesspools.

22. A cesspool has no bottom and pervious sides and is designed to leach wastewater.

23. The cesspools at the Site discharged wastewater into the soil and groundwater.

24. Groundwater at the Site migrates in a south-southeasterly direction towards the Great South Bay.

25. In or around 1990, the Site's sanitation system was disconnected from the on-site cesspools and connected to the Suffolk County sewer system.

26. From 1951, when manufacturing operations at the Site began, through approximately 1990, wastewater containing volatile organic compounds ("VOCs") and other hazardous substances was disposed of into the Site's sanitation system. These hazardous substances and their breakdown products leached into the soil and groundwater at the Site and into off-site groundwater.

27. As described in more detail below, DEC and County of Suffolk found numerous hazardous substances at the Site, including the VOCs 1,1,1-trichloroethane ("1,1,1-TCA"); trichloroethene ("TCE"); trichlorotrifluoroethane ("Freon 113"); 1,1-dichloroethane ("1,1-DCA"); 1,2-dichloethene ("1,2-DCE"); and tetrachloroethylene ("PCE"), and the metals mercury and cadmium.

28. EPA has designated all of the above substances as hazardous. 40 C.F.R. § 302.4.

29. Short-term exposure to high concentrations of 1,1,1-TCA can cause dizziness, lightheadedness, lack of coordination, unconsciousness, blood pressure loss, heart damage, and skin and eye irritation.

30. TCE is a carcinogen that may cause kidney cancer, liver cancer, and malignant lymphoma. Short-term exposure to high concentrations of TCE can cause dizziness, headaches, lack of coordination, unconsciousness, liver damage, possible kidney damage, and even death.

31. Dermal exposure to Freon 113 can irritate skin and eyes, and repeated exposure can cause dryness and cracking of the skin. Breathing Freon 113 can irritate the lungs, causing coughing and/or shortness of breath. Overexposure can cause lightheadedness and dizziness. High exposure can cause irregular heart beat and can be fatal.

32. 1,1-DCA often accompanies the presence of 1,1,1-TCA as a co-contaminant or breakdown product. Short-term exposure to high concentrations of 1,1-DCA can cause irregular heartbeats.

33. 1,2-DCE often accompanies the presence of TCE as a co-contaminant or breakdown product.

34. PCE is likely carcinogenic. Short-term acute exposure to PCE can cause dizziness, headaches, unconsciousness, and even death. PCE can be toxic to the central nervous system, kidney, liver, reproductive system, and developing fetuses.

35. Mercury is a possible carcinogen. Mercury exposure can damage the brain and kidneys. Developing fetuses and young children are especially sensitive to the effects of mercury. Short-term exposure to high concentrations of mercury may cause lung damage, nausea, vomiting, diarrhea, blood pressure or heart rate increases, and skin and eye irritation.

36. Cadmium is a likely carcinogen. Short-term exposure to high concentrations of cadmium can cause lung damage, vomiting, diarrhea, and even death. Long-term exposure to lower levels of cadmium can cause kidney damage and bone weakness.

**Manufacturing Operations at the Site Before 1984**

37. Beginning in approximately 1951, non-party Brown & Mole, Inc., renamed Dayton T. Brown, Inc. in approximately 1954 (together, "Brown"), owned the Site.

38. From approximately 1951 through 1965, Brown operated a machine shop at the Site that manufactured metal products.

39. From approximately 1966 through 1974, non-party Dubbings Electronics, Inc. ("Dubbings") operated at the Site. Dubbings' operations at the Site included the manufacture and duplication of audio cassettes.

40. In approximately 1969, ownership of the Site passed from Brown to non-party Strong-Niagara, a partnership, through a series of real estate transactions.

41. In approximately 1973, ownership of the Site passed from Strong-Niagara to non-parties Wilmington Property Associates, a partnership, and various affiliated entities and individuals.

42. In approximately 1976, ownership of the Site passed to non-party Barad Auto Industries Corp. ("Barad"). Between approximately 1976 and 1980, Barad operated a machine shop at the Site that manufactured automotive parts.

43. Between approximately 1977 and 1982, non-party Elite Controls Corp. ("Elite Controls") operated a machine shop at the Site that manufactured automotive parts, including electronic equipment.

**Irving Levey and OEM's Operations**

44. Between approximately 1984 and 1991, non-party OEM Machine World Inc. ("OEM"), a now-dissolved New York corporation, leased the Site.

45. The late Irving Levey was an owner and officer of OEM.

46. OEM operated a machine shop at the Site that manufactured and rebuilt automotive parts, including brake calipers, starters, and alternators.

47. OEM's activities required the use of VOCs such as 1,1,1-TCA and TCE as solvents and degreasers, as well as Freon 113 as a cleaning agent. 1,1-DCA and 1,2 DCE typically accompany 1,1,1-TCA and TCE, respectively, in product formulations or as their breakdown products in the environment.

48. Irving Levey oversaw the handling of hazardous substances, including 1,1,1-TCA, at the Site.

49. Among other things, Irving Levey signed permit applications with the Town of Babylon for the storage of hazardous chemicals at the Site, including 1,1,1-TCA.

50. Irving Levey also oversaw the disposal of hazardous substances at the Site, including disposal into the Site's sanitation system.

**Irving Levey's and the Levey Estate's Ownership of the Site**

51. In January 1990, Irving Levey purchased the Site.

52. In November 1990, Irving Levey died intestate, and ownership of the Site passed to the Levey Estate.

53. Irving's widow, Joan Levey, and his son, Steven Levey, were distributees of the Levey Estate.

54. Joan Levey was the first administrator of her late husband's estate. Following her

death, Steven Levey became the administrator of the Levey Estate.

**Operations at the Site After 1991**

55. From approximately 1992 until 2003, various non-party business entities operated at the Site.

56. The Site began to fall into neglect and disrepair during this time.

57. In or around 2003, the Site became vacant.

58. In 2006, non-party Wharton Pryce Realty Company, Inc. acquired the Site from the Levey Estate, and subsequently conveyed the Site to Crescent Group Realty Inc., which is still the owner of the Site.

**Investigation of the Site by the Suffolk County Department of Health Services**

59. In September 2002, the Suffolk County Department of Health Services ("Suffolk Health") installed groundwater sampling wells at the Site.

60. Suffolk Health detected numerous VOCs, including 1,1,1-TCA, in some of the groundwater samples. Based on the locations of the wells where the samples were taken, and the direction of groundwater flow on the Site, Suffolk Health suspected that the 1,1,1-TCA originated at the Site rather than another site upgradient of the Site.

61. In March 2003, Suffolk Health installed additional sampling wells on the Site. Samples from those wells detected concentrations of 1,1,1-TCA in shallow, but not deep, groundwater that were higher than the prior samples. Based on those samples, Suffolk Health concluded that the source of 1,1,1-TCA was located at the Site, and that releases may still have been occurring.

**DEC's Response Actions at the Site**

62. In May 2005, DEC designated the site as a Potential Registry Site under New

York State's Inactive Hazardous Waste Disposal Site Program ("State Superfund Program").

63. The next year, DEC contracted with Environmental Resource Management ("ERM") to evaluate the potential contamination at the Site.

64. In April 2006, ERM conducted field tests, including testing samples of groundwater, soil, soil vapor, and the contents of storage drums abandoned at the Site.

65. DEC evaluates the contamination of soil and groundwater under the State Superfund Program in reference to threshold levels established by DEC's Standards, Criteria, and Guidance for Investigation and Remediation of Inactive Hazardous Waste Disposal Sites ("DEC standards"), which are developed by DEC and other state and federal agencies to protect human health and the environment.

66. The New York State Department of Health ("DOH") has established similar criteria for assessing hazardous substances in indoor air.

67. ERM's investigation detected the following:

- VOCs in groundwater in excess of DEC standards, including 1,1,1-TCA; Freon 113; PCE; TCE; and 1,1-DCA. Among these substances, 1,1,1-TCA was detected in the highest concentrations.

- Heavy metals, including mercury, in groundwater in excess of DEC standards.

- VOCs in soil vapor, including 1,1,1-TCA, PCE, and acetone, in excess of DOH standards.

68. EPA has designated all of the foregoing as hazardous substances. 40 C.F.R. § 302.4.

69. In 2009, DEC began the remedial investigation and feasibility study ("RI/FS") process for the Site to evaluate fully the extent of groundwater, soil, soil vapor, and sediment contamination, and identify appropriate responses. The RI/FS process was divided between two "operable units": Operable Unit 1 ("OU1"), the Site; and Operable Unit 2 ("OU2"), which

consisted of off-site groundwater and soil vapor contamination originating from the Site.

70. In or around November 2010, DEC listed the Site as Site No. 152201 in the State Superfund Program's Registry of Inactive Hazardous Waste Disposal Sites. DEC designated it as "Class 2," denoting that the Site posed a significant threat to the public health or environment and required remedial action.

71. In April 2010, DEC contractor Shaw Environmental ("Shaw") did a remedial investigation of OU2, the off-site area. Shaw's groundwater sampling detected VOCs, predominantly 1,1,1-TCA.

72. In March 2013, DEC issued a Record of Decision ("ROD") selecting a remedy for OU2 which required, among other things, the monitoring of contaminant levels at OU2 during remedial activity at OU1.

73. Between 2011 and 2013, Shaw conducted a remedial investigation for OU1, the on-site area.

74. Shaw's groundwater sampling detected VOCs above DEC standards, including 1,1,1-TCA; 1,1-DCA; Freon 113; TCE; PCE; and 1,2-DCE.

75. Shaw identified eight abandoned and backfilled cesspools at the Site.

76. Shaw's soil sampling from the cesspools detected VOCs above DEC standards at Cesspool 5, the cesspool located nearest the building. Among these VOCs, 1,1,1-TCA was present in the highest concentration. Other VOCs that exceeded DEC standards included 1,1-DCA, TCE, 1,2-DCE, and PCE.

77. At several other cesspools, Shaw's sampling also detected heavy metals, including cadmium and mercury, that exceeded DEC standards.

78. Shaw collected sub-slab soil vapor samples from points beneath the building,

detecting 1,1,1-TCA, Freon 113, TCE, and PCE at levels exceeding DOH standards.

79. In November 2014 and January 2015, a DEC contractor removed Cesspool 5 and surrounding soils as an interim remedial measure—also termed a "removal" action under CERCLA. 42 U.S.C. § 9601(23).

80. In May 2015, DEC issued a "Feasibility Study" for OU1. The study recommended:

- No further physical remediation of metals because the remaining metals of concern were located deep enough to allow for expected uses of the property;

- Development of a site management plan to monitor groundwater for natural attenuation of VOCs, to evaluate and address any future soil vapor intrusion, to regulate future excavation, and to maintain existing surface cover as an engineering control; and

- An easement to allow use and development of the property subject to restricted groundwater use, implementation of the site management plan, and the evaluation of soil vapor intrusion before future occupancy.

81. In February 2016, DEC, in consultation with DOH, issued the ROD for OU1, adopting the recommendations of the May 2015 Feasibility Study.

82. As of November 4, 2015, the State had incurred costs of approximately $820,000 in responding to the release of hazardous substances at the Site. This sum does not include costs incurred by the State since November 4, 2015 for ongoing monitoring and other controls.

83. In May 2017, DEC and Brown (which owned the Site from approximately 1951 to 1969 and operated a machine shop there from approximately 1951 to 1965) settled Brown's liability for costs for $130,000.

## FIRST CLAIM FOR RELIEF
## COST RECOVERY UNDER CERCLA

84. The State hereby incorporates by reference the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

85. The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

86. Buildings, structures, and equipment where hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Site are also "facilities" under 42 U.S.C. § 9601(9).

87. There have been "releases" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) and (22), at and from the Site and other facilities at the Site into the environment.

88. Among the hazardous substances that were released into the environment at and from the Site and other facilities at the Site are 1,1,1-TCA, 1,1-DCA, TCE, 1,2-DCE, Freon 113, PCE, cadmium, and/or mercury (the "contaminants of concern").

89. The contaminants of concern contaminated the "environment" within the meaning of 42 U.S.C. § 9601(8).

90. The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in 42 U.S.C. § 9601(25), to the release of the contaminants of concern at and from the Site and other facilities at the Site, including costs to assess, monitor, evaluate, oversee, and conduct "removal actions" and/or "remedial actions," as those terms are defined in 42 U.S.C. §§ 9601(23) and 9601(24).

91. 42 U.S.C. § 9607(a) provides that (i) persons who are current owners or operators of a facility and (ii) persons who were owners or operators at the time that hazardous substances

were disposed shall be liable for the costs of removal and remedial actions that are "not inconsistent with the national contingency plan."

92. The response actions that the State has taken and will take to respond to the release of hazardous substances at the Site are not inconsistent with the "national contingency plan." *See* 40 C.F.R. Part 300.

93. Irving Levey is a "person" within the meaning of 42 U.S.C. § 9601(21).

94. Irving Levey managed, directed, or otherwise conducted OEM's operations at the Site and other facilities at the Site, including operations specifically related to the disposal of hazardous substances and decisions about compliance with environmental laws and regulations, when hazardous substances were disposed at the Site, and thus was an operator of the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

95. When Irving Levey died, his liability under CERCLA passed to the Levey Estate, now administered by Steven Levey.

96. Steven Levey is the primary surviving distributee of the Levey Estate, and is liable under the New York Estates, Powers and Trusts Law ("EPTL") § 12-1.1(a), to the extent of any property received by him as such, for any judgment the State may obtain against the Levey Estate in this action that may not be recovered from the Estate.

## SECOND CLAIM FOR RELIEF
## RESTITUTION

97. The State hereby incorporates by reference the allegations contained in Paragraphs 1 through 96 as if fully set forth herein.

98. The threat of release and release of hazardous substances at and from the Site into the environment, including soil, groundwater, and sediment at the Site, constituted a public nuisance endangering public health and safety.

99. Irving Levey participated in the creation and/or maintenance of this public nuisance.

100. Irving Levey and the Levey Estate had a duty to assess and/or abate this public nuisance and/or to remediate the contamination.

101. Irving Levey, and then the Levey Estate, failed to do so.

102. The State discharged the duty of Irving Levey and the Levey Estate to assess and/or abate this nuisance and/or to remediate the contamination.

103. By discharging the duty of Irving Levey and the Levey Estate to assess and/or abate this nuisance and/or to remediate the contamination, the State has conferred a benefit upon, and unjustly enriched Steven Levey, and Steven Levey is strictly, and jointly and severally, liable to the State in restitution for the value of the benefit conferred upon him by the State.

## PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against defendant, upon the claim set forth above, and requests that this Court enter judgment against defendant, as follows:

1. Declaring defendant, in his representative capacity, to be strictly liable to the State under CERCLA for, and awarding to the State, all costs and expenses, including interest, attorneys' fees, and other costs of enforcement incurred by the State in responding to the release of hazardous substances at and from the Site and other facilities at the Site.

2. Declaring defendant, in his representative capacity, to be strictly liable to the State under CERCLA for all future response costs and expenses, including interest, attorneys' fees, and other costs of enforcement to be incurred by the State in responding to the release of hazardous substances at and from the Site and other facilities at the Site.

3. Declaring defendant to be strictly liable to the State in restitution, and awarding to

the State all past and future costs and expenses, including interest, attorneys' fees, and other costs of enforcement incurred by the State in abating the public nuisance at and in the vicinity of the Site.

4. Declaring defendant, in his individual capacity, to be liable to the State under the EPTL, to the extent of any property received by defendant from the Levey Estate, for that portion of any judgment awarded to the State from the Levey Estate in this action that is not recovered or recoverable from the Levey Estate through defendant in his representative capacity.

5. Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated: New York, New York
November 17, 2017

                                        ERIC T. SCHNEIDERMAN
                                        Attorney General of the State of New York
                                        Attorney for Plaintiff

                              By: /s/Austin Thompson
                                   Assistant Attorney General
                                   Environmental Protection Bureau
                                   120 Broadway, 26th Floor
                                   New York, New York 10271
                                   (212) 416-8464
                                   austin.thompson@ag.ny.gov