UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

STATE OF NEW YORK, and BASIL SEGGOS,   :
COMMISSIONER OF THE NEW YORK STATE   :
DEPARTMENT OF ENVIRONMENTAL   :
CONSERVATION,   :
  :   **SECOND AMENDED COMPLAINT**
  Plaintiffs,   :
  :   NO. 17-cv-06739-JMA-AYS
  - against -   :
  :
CRESCENT GROUP REALTY INC., DOMINICK   :
MAVELLIA, KENNETH AUERBACH, EUGENE   :
SMITH, and FLEXTRONICS AUTOMOTIVE USA   :
MANUFACTURING CO.,   :
  :
  Defendants.   :
  :
  :
  :
----------------------------------------------------------------------- x

Plaintiffs the State of New York and Basil Seggos ("Seggos"), in his capacity as

Commissioner of the New York State Department of Environmental Conservation ("DEC")

(together, the "State"), by their attorney Letitia James, Attorney General of the State of New

York, as and for their Second Amended Complaint, allege as follows, upon information and

belief:

## NATURE OF THE ACTION

1.  This is an action under the Comprehensive Environmental Response, Compensation

and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 ("CERCLA"), as amended, to recover costs

that have been and will be incurred by the State in responding to the release of hazardous

substances into the environment at and from the premises located at 1305 South Strong Avenue,

Copiague, New York (the "Site").

2. This action seeks recovery of the State's response costs incurred to date and a declaration of liability for the State's future response costs.

## JURISDICTION AND VENUE

3. This Court has exclusive jurisdiction over the State's Claim for Relief, which arises under the laws of the United States, pursuant to 28 U.S.C. §§ 1331 and 2201 and 42 U.S.C. §§ 9607 and 9613. The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

4. Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the release of hazardous substances that gives rise to this action occurred within this District and the Site is located within this District.

## THE PARTIES

5. Plaintiff the State of New York brings this action to recover costs that have been and will be incurred by the State in responding to the release of hazardous substances at and from the Site.

6. Plaintiff Basil Seggos is the Commissioner of the New York State Department of Environmental Conservation. Commissioner Seggos brings this action in his official capacity to recover costs that have been incurred by DEC in responding to the release of hazardous substances at and from the Site.

7. Defendant Crescent Group Realty Inc. ("Crescent Group") is a business corporation organized under the laws of New York with its principal executive office at 71 N First Street, Deer Park, NY 11729.

8. Crescent Group currently owns and operates the Site.

9. Defendant Dominick Mavellia, sued in his individual capacity, is a resident of Deer Park, New York. Mavellia is the President of and one of the three shareholders in Crescent Group. With defendant Kenneth Auerbach, Mavellia currently operates the Site and is also responsible for the liabilities of the Crescent Group.

10. Defendant Kenneth Auerbach, sued in his individual capacity, is a resident of Patchogue, New York. Auerbach is one of the three shareholders in Crescent Group. With Mavellia, Auerbach currently operates the Site and is also responsible for the liabilities of the Crescent Group.

11. Defendant Eugene G. Smith, sued in his individual capacity, is a resident of Yaphank, New York. Smith is one of the three shareholders in Crescent Group. He is responsible for the liabilities of the Crescent Group.

12. Defendant Flextronics Automotive USA Manufacturing Co. ("Flextronics") is an Ohio corporation that is a corporate successor of Elite Controls Corp. ("Elite Controls"), a now dissolved New York corporation that formerly operated at the Site. The Court so-ordered a consent order between the State and Flextronics on July 18, 2019 (Dkt. No. 50).

## CERCLA

13. CERCLA provides that, when there is a release of hazardous substances into the environment from a facility, certain categories of persons are liable to the State for the costs that the State incurs to respond to the release as long as the State's response actions are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

14. "Hazardous substances" are defined in 42 U.S.C. § 9601(14) to include substances that the U.S. Environmental Protection Agency ("EPA") has designated as hazardous pursuant to

42 U.S.C. § 9602. The substances that EPA has designated as hazardous are listed in 40 C.F.R. § 302.4.

15. A "release" includes spilling, leaking, leaching, and disposing "into the environment." *Id.* § 9601(22). The "environment" includes groundwater, land surface, and subsurface strata. *Id.* § 9601(8).

16. A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C.§ 9601(9). It also includes buildings, structures, and equipment. *Id.*

17. The term "respond" includes taking "removal" actions, "remedial" actions, and related enforcement activities. *Id.* § 9601(25). A "removal" action includes the "cleanup or removal of released hazardous substances from the environment" as well as the assessment and evaluation of a release. *Id.* § 9601(23). A "remedial" action means "those actions consistent with permanent remedy taken instead of or in addition to removal actions." *Id.* § 9601(24).

18. The "national contingency plan" is set forth in 40 C.F.R. Part 300.

19. The persons liable for response costs under 42 U.S.C. § 9607(a) include: (i) current owners and operators of a facility and (ii) owners and operators of a facility at the time of disposal of hazardous substances. "Persons" includes individuals and corporations. 42 U.S.C. § 9601(21).

20. 42 U.S.C. § 9613(g)(2) provides that in an action for response costs under CERCLA, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding in any subsequent action or actions to recover further response costs or damages."

# FACTUAL ALLEGATIONS

## The Site

21. The Site is located at 1305 South Strong Avenue, Copiague, Town of Babylon, Suffolk County, New York, and identified on the Suffolk County tax map as District 100, Section 198, Block 2, Lot 29. The Site is bounded by Chettic Avenue to the north, South Strong Avenue to the east, and Victoria Avenue to the south.

22. The Site occupies about 1.03 acres that are partially concrete-paved, partially unpaved, and partially vegetated, with an approximately 20,000-square foot building bisecting the property from east to west. The surrounding area is suburban, with residential properties adjacent to the east and south, and industrial/commercial properties adjacent to the north and west. The Site is currently vacant.

23. From approximately 1951 to 1990, the Site's sanitation system discharged into on-site underground structures, including cesspools.

24. A cesspool has pervious sides and no bottom and is designed to leach wastewater into the surrounding soil.

25. The cesspools at the Site discharged wastewater into the soil and groundwater.

26. Groundwater at the Site migrates in a south-southeasterly direction towards the Great South Bay.

27. In or around 1990, the Site's sanitation system was disconnected from the on-site cesspools and connected to the Suffolk County sewer system.

28. From 1951, when manufacturing operations at the Site began, through approximately 1990, wastewater containing volatile organic compounds ("VOCs") and other hazardous substances was discharged into the Site's sanitation system. These hazardous substances and

their breakdown products leached into the soil and groundwater at the Site and into off-site groundwater.

29. As described in more detail below, DEC and County of Suffolk found numerous hazardous substances at the Site, including the VOCs 1,1,1-trichloroethane ("1,1,1-TCA"); trichloroethene ("TCE"); trichlorotrifluoroethane ("Freon 113"); 1,1-dichloroethane ("1,1-DCA"); 1,2-dichloethene ("1,2-DCE"); and tetrachloroethylene ("PCE"), and the metals mercury and cadmium.

30. EPA has designated all of the above substances as hazardous. 40 C.F.R. § 302.4.

31. Short-term exposure to high concentrations of 1,1,1-TCA can cause dizziness, lightheadedness, lack of coordination, unconsciousness, blood pressure loss, heart damage, and skin and eye irritation.

32. TCE is a carcinogen that may cause kidney cancer, liver cancer, and malignant lymphoma. Short-term exposure to high concentrations of TCE can cause dizziness, headaches, lack of coordination, unconsciousness, liver damage, possible kidney damage, and even death.

33. Dermal exposure to Freon 113 can irritate skin and eyes, and repeated exposure can cause dryness and cracking of the skin. Breathing Freon 113 can irritate the lungs, causing coughing and/or shortness of breath. Overexposure can cause lightheadedness and dizziness. High exposure can cause irregular heartbeat and can be fatal.

34. 1,1-DCA often accompanies the presence of 1,1,1-TCA as a co-contaminant or breakdown product. Short-term exposure to high concentrations of 1,1-DCA can cause irregular heartbeat.

35. 1,2-DCE often accompanies the presence of TCE as a co-contaminant or breakdown product.

36. PCE is likely carcinogenic. Short-term acute exposure to PCE can cause dizziness, headaches, unconsciousness, and even death. PCE can be toxic to the central nervous system, kidney, liver, reproductive system, and developing fetuses.

37. Mercury is a possible carcinogen. Mercury exposure can damage the brain and kidneys. Developing fetuses and young children are especially sensitive to the effects of mercury. Short-term exposure to high concentrations of mercury may cause lung damage, nausea, vomiting, diarrhea, blood pressure or heart rate increases, and skin and eye irritation.

38. Cadmium is a likely carcinogen. Short-term exposure to high concentrations of cadmium can cause lung damage, vomiting, diarrhea, and even death. Long-term exposure to lower levels of cadmium can cause kidney damage and bone weakness.

### Manufacturing Operations at the Site Before 1976

39. Beginning in approximately 1951, non-party Brown & Mole, Inc., renamed Dayton T. Brown, Inc. in approximately 1954 (together, "Brown"), owned the Site.

40. From approximately 1951 through 1965, Brown operated a machine shop at the Site that manufactured metal products.

41. From approximately 1966 through 1974, non-party Dubbings Electronics, Inc. ("Dubbings") operated at the Site. Dubbings' operations at the Site included the manufacture and duplication of audio cassettes.

42. In approximately 1969, ownership of the Site passed from Brown to non-party Strong-Niagara, a partnership, through a series of real estate transactions.

43. In approximately 1973, ownership of the Site passed from Strong-Niagara to non-parties Wilmington Property Associates, a partnership, and various affiliated entities and individuals.

44. In approximately 1976, ownership of the Site passed to non-party Barad Auto Industries Corp. ("Barad"). Between approximately 1976 and 1980, Barad operated a machine shop at the Site that manufactured automotive parts, including injection molding for rotors.

**Elite Controls and Its Successor, Flextronics**

45. Between approximately 1977 and 1982, non-party Elite Controls operated at the Site, manufacturing after-market electronic parts for automobiles, principally ignition parts.

46. Elite Controls obtained permits from the Town of Babylon for the storage of hazardous chemicals at the Site, including 1,1,1-TCA.

47. Elite's activities required the use of VOCs such as 1,1,1-TCA and TCE as solvents and degreasers.

48. Elite Controls disposed of hazardous substances at the Site, including into the Site's sanitation system.

49. In approximately 1982, Elite Controls moved its manufacturing operations from the Site to 301 West Hoffman Avenue in Lindenhurst, New York ("301 West Hoffman").

50. In approximately 1983, the Bank foreclosed on Elite Controls' loan and took control of its assets. Elite Controls permanently ceased doing business.

51. Elite Controls lacked assets from this time forward, although it was not formally dissolved until 1992.

52. Within months of Elite Controls' cessation of business, Elite Electronic International Corp. purchased Elite Controls' former assets from the Bank and resumed manufacturing operations at 301 West Hoffman.

53. In approximately 1992, Elite Electronic and Dynamic Industries of Michigan, Inc., a Michigan corporation, merged into Beta Mfg. Co., an Ohio corporation.

54. In approximately 1995, Beta Mfg. Co. was renamed Saturn Manufacturing Co.

55. In approximately 2013, Saturn Manufacturing Co. was renamed Flextronics Automotive USA Manufacturing Co.

56. The State originally named Flextronics as a defendant but settled with the company pursuant to a consent decree (Dkt. No. 50).

**Irving Levey**

57. Between approximately 1984 and 1991, non-party OEM Machine World Inc. ("OEM"), a now-dissolved New York corporation, leased the Site.

58. Non-party Irving Levey was an owner and officer of OEM.

59. OEM operated a machine shop at the Site that manufactured and rebuilt automotive parts, including brake calipers, starters, and alternators, which included the use of VOCs such as 1,1,1-TCA, TCE and Freon 113

60. In January 1990, Irving Levey purchased the Site.

61. In November 1990, Irving Levey died intestate, and ownership of the Site passed to the Levey Estate.

**Investigation of the Site by the Suffolk County Department of Health Services**

62. From approximately 1992 until 2003, various non-party business entities operated at the Site. The Site began to fall into neglect and disrepair during this time. In or around 2003, the Site became vacant.

63. In September 2002, the Suffolk County Department of Health Services ("Suffolk Health") installed groundwater-sampling wells at the Site.

64. Suffolk Health detected numerous VOCs, including 1,1,1-TCA, in some of the groundwater samples. Based on the locations of the wells where the samples were taken, and the

direction of groundwater flow on the Site, Suffolk Health suspected that the 1,1,1-TCA originated at the Site rather than another site upgradient of the Site.

65.  In March 2003, Suffolk Health installed additional sampling wells on the Site. Samples from those wells detected concentrations of 1,1,1-TCA in shallow, but not deep, groundwater that were higher than the prior samples. Based on those samples, Suffolk Health concluded that the source of 1,1,1-TCA was located at the Site, and that releases may still have been occurring.

66. In May 2005, DEC designated the site as a Potential Registry Site under New York State's Inactive Hazardous Waste Disposal Site Program ("State Superfund Program").

**The Crescent Group and the Crescent Individuals**

67. In November 2005, Mavellia, Auerbach, and Smith (the "Crescent Individuals") entered into an operating agreement in which they agreed to acquire the Site by purchasing it from the Levey Estate. Smith had an existing mortgage on the Site and the partners agreed that they would acquire the Site subject to that debt. Mavellia and Auerbach agreed to contribute funds to purchase the Site and develop it—including any funds necessary for its environmental remediation.

68. In or about December 2005, non-party Wharton Pryce Realty Company, Inc. ("Wharton Pryce"), entered into a contract to purchase the Site for $30,000 from the Levey Estate, with the intention of transferring ownership of the Site to another entity. Wharton Pryce is a New York corporation with its principal executive office at 71 N. First Street, Deer Park, NY

11729. Mavellia is the Chief Executive Officer and sole owner of Wharton Pryce. On June 1, 2006, Wharton Pryce closed on the Site.

69. Even though Wharton Pryce had a contract to purchase the Site, on or about March 8, 2006 Mavellia applied on behalf of another entity he owns, St. James Crescent Group, to clean up the Site under New York State's Brownfield Cleanup Program.

70. Under the Brownfields Cleanup Program, an accepted applicant agrees to clean up a hazardous waste site in return for tax benefits.

71. Mavellia's application included a "Phase I Environmental Site Assessment" performed by Impact Environmental that evaluated environmental conditions at the Site, including existing or past releases of hazardous substances.

72. The Phase I assessment found that "it appears that a source of hazardous waste (1,1,1-Tricholorethane or TCA) exists on the subject property requiring further investigation." Accordingly, Impact Environmental recommended that a "Phase II" assessment be conducted for the Site. The report stated that this recommendation was supported by various "recognized environmental conditions" at the Site, including evidence that an on-site sanitary system had formerly been used at the Site while manufacturing operations were taking place.

73. In order to determine what steps St. James would have to take to clean up the Site, DEC contracted with Environmental Resource Management ("ERM"), an environmental consultancy, to evaluate the potential contamination at the Site.

74. In April 2006, ERM conducted field tests, including testing samples of groundwater, soil, soil vapor, and the contents of storage drums abandoned at the Site.

75. DEC evaluates the contamination of soil and groundwater under the State Superfund Program in reference to threshold levels established by DEC's Standards, Criteria, and Guidance

for Investigation and Remediation of Inactive Hazardous Waste Disposal Sites ("DEC standards"), which are developed by DEC and other state and federal agencies to protect human health and the environment.

76. The New York State Department of Health ("DOH") has established similar criteria for assessing hazardous substances in indoor air ("DOH standards").

77. ERM's investigation detected the following:

- VOCs in groundwater in excess of DEC standards, including 1,1,1-TCA; Freon 113; PCE; TCE; and 1,1-DCA. Among these substances, 1,1,1-TCA was detected in the highest concentrations.

- Heavy metals, including mercury, in groundwater in excess of DEC standards.

- VOCs in soil vapor, including 1,1,1-TCA, PCE, and acetone, in excess of DOH standards.

78. ERM also identified suspected locations of abandoned cesspools at the Site that may have been used to dispose of hazardous substances, and observed that groundwater sampling wells near those locations "exhibited the highest concentrations of TCA, which may indicate some residual contamination is leaching from a sludge layer left behind after the cesspools were abandoned."

79. ERM's report made extensive recommendations for supplemental site investigation work and remediation, including further investigation to "[d]etermine the precise location of the cesspools, and investigate and sample the cesspools, and prove whether or not residual contamination left after the abandonment is contributing to the elevated [chlorinated VOC] (primarily 1,1,1-TCA) concentrations in groundwater found in the vicinity of the former cesspools."

80. After Wharton Pryce closed its purchase of the Site on June 1, 2006, Mavellia, Auerbach, and Smith (the "Crescent Individuals") decided not to transfer the Site from Wharton

Pryce to St. James Crescent, which already owned other property, including a property at 215 Lake Avenue, Saint James, New York, that it later sold for $800,000 in 2008.

81. Instead, on October 25, 2006, the Crescent Individuals created a new corporation to hold the Site: Crescent Group.

82. By letter on November 3, 2006, Auerbach asked DEC to admit Crescent Group to the Brownfield Cleanup Program in St. James's place for "accounting reasons."

83. On November 11, 2006, Wharton Pryce conveyed the Site to Crescent Group for no monetary consideration.

84. The only consideration that Wharton Pryce received, according to the Crescent Individuals' and Crescent Group's own admission, was Crescent Group's "assumption of and agreement to repay all debt [related to the Site], including, but not limited to, mortgages, taxes, costs of renovation and cleanup."

85. On November 13, 2006, Mavellia submitted a Brownfield Cleanup Program application amendment to DEC requesting that Crescent Group be admitted to the program in the place of St. James. Mavellia signed the application twice; once in his capacity as President of St. James, and once in his capacity as President of Crescent Group.

86. At all times that Crescent Group has owned the Site, Crescent Group, Mavellia, and Auerbach have directed, managed, and controlled the affairs of the Site and other facilities at the Site, including operations having to do with the leakage of hazardous substances and decisions about complying with environmental laws.

87. Mavellia and Auerbach also communicated with Impact Environmental ("Impact"), authorized the work Impact performed for Crescent Group, and then paid for that work from

accounts they controlled personally. Smith deferred to Mavellia and Auerbach on the question of environmental remediation because they were paying for the work.

88. The principal engineer for Impact who worked on the Site communicated with only Mavellia and Auerbach regarding the Site, including when he needed authorization to perform work. He could not recall ever meeting Smith.

89. In December 2006, DEC and Crescent Group executed a Brownfield Cleanup Agreement (the "Agreement") requiring Crescent Group to develop and implement a remedial investigation of contamination at the Site and, if warranted, proceed with cleanup activities.

90. Crescent Group, Mavellia, and Auerbach arranged for environmental consultants to conduct initial investigations to evaluate the release of hazardous substances at the Site, and the consultants developed a remedial work plan for the Site. That remedial work plan indicated that it was likely that sources of contamination were still present on the Site and proposed that a remedial investigation be conducted to, among other things, determine whether those sources included the cesspools.

91. On March 12, 2008, DEC approved Crescent Group's work plan.

92. In August 2010, after Crescent Group repeatedly missed deadlines required by the Agreement, including a deadline to complete a remedial investigation of the Site, DEC terminated Crescent Group's participation in the Brownfields Cleanup Program.

93. At all times that they have owned and controlled the Site, Crescent Group, Mavellia, and Auerbach have been aware of the identified VOC contamination in groundwater at the Site and suspected ongoing leakage of VOCs from abandoned cesspools at the Site.

94. Crescent Group, Mavellia, and Auerbach did not take any further action to remediate the identified contamination by hazardous waste and suspected ongoing leakage of hazardous

substances at the Site, including implementing their consultants' recommendation to investigate whether the abandoned cesspools were the source of ongoing contamination.

95. At all relevant times, Crescent Group was severely undercapitalized for the purpose of remediating the Site. Crescent Group never had a bank account, funds, or any other form of capital. Instead, Mavellia and Auerbach paid Crescent's expenses from their own accounts.

96. The Crescent Individuals used the undercapitalization of Crescent Group to decrease their potential liability for cleanup obligations. During a board meeting, the Crescent Individuals stated their intent to "walk away" from the Site if DEC demanded too much from them to clean up the Site and observed that this possibility provided them with "leverage" in their discussions with the State.

97. The Site was Crescent Group's only asset. Crescent Group, Mavellia, and Auerbach operated the Site as a real-estate asset, marketing it to potential lessors and buyers, hiring a structural engineer to consider alterations to the building on the Site, and considering a conversion of the Site to residential use.

98. In addition to its obligation to clean up the Site under the Agreement, the Crescent Group was also liable for unpaid property taxes owed to Suffolk County and the Town of Babylon, which at the time were over $1,000,000.

99. Crescent Group's 2007 federal income tax return listed $734,681 in assets, the approximate market value of the Site. That market value did not take into account the costs of a remedial investigation and other actions to remediate the Site or tax liabilities. It further listed $92,019 in new loans from shareholders, and $645,148 in mortgage, notes, and bonds payable in one year or more, meaning that its liabilities exceeded its assets.

100.    As of 2013, Crescent Group owed its owners, the Crescent Individuals, approximately $650,000 in "capital contributions." It owed Mavellia over $300,000, Auerbach over $50,000, and Smith approximately $250,000.

101.    Aside from the property taxes owed to Suffolk County and the Town of Babylon, the Crescent Individuals are the Crescent Group's only creditors.

102.    Because Crescent Group owes the Crescent Individuals over $650,000, owes over $1,000,000 in property taxes, and has no assets aside from the Site, its liabilities have exceeded its assets since it acquired the Site, thereby shielding the Crescent Group from over half a million dollars in State Superfund Program cleanup costs.

103.    The Crescent Group lacks any semblance of a corporate existence separate from the Crescent Individuals. It has no employees. Aside from the Site, Crescent Group has no assets.

104.    The Crescent Group's corporate address, 71 N First Street, Deer Park, NY 11729, is identical to that of Wharton Pryce, and is also the principal place of business of Mavellia, one of the Crescent Individuals.

105.    Crescent Group's finances are wholly intertwined with those of its owners, the Crescent Individuals. In 2010, when Mavellia made Crescent Group's required payments under the Brownfield Program to DEC, the payments came not from a Crescent Group bank account, but from a Wharton Pryce account, the same entity that the Crescent Individuals had used to purchase the Site. Crescent Group has never had a bank account, and, indeed, all payments made on behalf of the Crescent Group have come from the accounts of Mavellia, Auerbach, or another corporate entity one of them controls.

106.    Crescent Group also fails to adhere to corporate formalities in the conduct of its business. While the Crescent Individuals were, as of 2013, "directors," they had no terms of

office. Crescent Group did not keep records such as a profit and loss statement or a balance sheet; it has had only three board meetings with minutes during its 12-year existence. The few records related to Crescent were kept at the office of Wharton Pryce—the same entity that transferred the Site to Crescent Group for no monetary consideration.

107.    The transfer of the site from Wharton Pryce, another corporation controlled by Mavellia, to Crescent Group was not an arms-length transaction because there was no monetary consideration.

**DEC's Cleanup of the Site**

108.    In 2009, DEC began the remedial investigation and feasibility study ("RI/FS") process for the Site to evaluate fully the extent of groundwater, soil, soil vapor, and sediment contamination, and identify appropriate responses. The RI/FS process was divided between two "operable units": Operable Unit 1 ("OU1"), the Site; and Operable Unit 2 ("OU2"), which consisted of off-site groundwater and soil vapor contamination originating from the Site.

109.    In or around November 2010, DEC listed the Site as Site No. 152201 in the State Superfund Program's Registry of Inactive Hazardous Waste Disposal Sites. DEC designated it as "Class 2," denoting that the Site posed a significant threat to the public health or environment and required remedial action.

110.    In April 2010, DEC contractor Shaw Environmental ("Shaw") did a remedial investigation of OU2, the off-site area. Shaw's groundwater sampling detected VOCs, predominantly 1,1,1-TCA.

111.    In March 2013, DEC issued a Record of Decision ("ROD") selecting a remedy for OU2 which required, among other things, the monitoring of contaminant levels at OU2 during remedial activity at OU1.

112.    Between 2011 and 2013, Shaw conducted a remedial investigation for OU1, the on-site area.

113.    Shaw's groundwater sampling detected VOCs above DEC standards, including 1,1,1-TCA; 1,1-DCA; Freon 113; TCE; PCE; and 1,2-DCE.

114.    Shaw identified eight abandoned and backfilled cesspools at the Site.

115.    Shaw's soil sampling from the cesspools detected VOCs above DEC standards at Cesspool 5, the cesspool located nearest the building. Among these VOCs, 1,1,1-TCA was present in the highest concentration. Other VOCs that exceeded DEC standards included 1,1-DCA, TCE, 1,2-DCE, and PCE.

116.    At several other cesspools, Shaw's sampling also detected heavy metals, including cadmium and mercury, that exceeded DEC standards.

117.    Shaw collected sub-slab soil vapor samples from points beneath the building, detecting 1,1,1-TCA, Freon 113, TCE, and PCE at levels exceeding DOH standards.

118.    In November 2014 and January 2015, a DEC contractor removed Cesspool 5 and surrounding soils as an interim remedial measure—also termed a "removal" action under CERCLA. 42 U.S.C. § 9601(23).

119.    In May 2015, DEC issued a "Feasibility Study" for OU1. The study recommended:

- No further physical remediation of metals because the remaining metals of concern were located deep enough to allow for expected uses of the property;

- Development of a site management plan to monitor groundwater for natural attenuation of VOCs, to evaluate and address any future soil vapor intrusion, to regulate future excavation, and to maintain existing surface cover as an engineering control; and

- An easement to allow use and development of the property subject to restricted groundwater use, implementation of the site management plan, and the

evaluation of soil vapor intrusion before future occupancy.

120.    In February 2016, DEC, in consultation with DOH, issued the ROD for OU1,

adopting the recommendations of the May 2015 Feasibility Study.

121.    As of November 4, 2015, the State had incurred costs of approximately $820,000

in responding to the release of hazardous substances at the Site. This sum does not include costs

incurred by the State since November 4, 2015 for ongoing monitoring and other controls.

122.    In May 2017, DEC and Brown (which owned the Site from approximately 1951

to 1969 and operated a machine shop there from approximately 1951 to 1965) settled Brown's

liability for costs for $87,500.

123.    During Crescent Group's ownership of the Site, however, it became an attractive

nuisance. Mavellia received multiple summonses for violations of the New York State Fire

Code. In April 2017, a fire caused substantial damage to the Site. And in January 2020, the Town

of Babylon razed the building on the Site after deeming it unsafe and structurally unsound.

### CLAIM FOR RELIEF
### COST RECOVERY UNDER CERCLA

124.    The State hereby incorporates by reference the allegations contained in

Paragraphs 1 through 123 as if fully set forth herein.

125.    The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

126.    Buildings, structures, and equipment where hazardous substances were deposited,

stored, disposed of, placed, or otherwise came to be located at the Site are also "facilities" under

42 U.S.C. § 9601(9).

127.    There have been "releases" of "hazardous substances," as those terms are defined

in 42 U.S.C. §§ 9601(14) and (22), at the Site and from the Site and other facilities at the Site

into the environment.

19

128.     Among the hazardous substances that were released into the environment at and from the Site and other facilities at the Site are 1,1,1-TCA, 1,1-DCA, TCE, 1,2-DCE, Freon 113, PCE, cadmium, and/or mercury (the "contaminants of concern").

129.     The contaminants of concern contaminated the "environment" within the meaning of 42 U.S.C. § 9601(8).

130.     The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in 42 U.S.C. § 9601(25), to the release of the contaminants of concern at and from the Site and other facilities at the Site, including costs to assess, monitor, evaluate, oversee, and conduct "removal actions" and/or "remedial actions," as those terms are defined in 42 U.S.C. §§ 9601(23) and 9601(24).

131.     42 U.S.C. § 9607(a) provides that (i) persons who are current owners or operators of a facility and (ii) persons who were owners or operators at the time that hazardous substances were disposed shall be liable for the costs of removal and remedial actions that are "not inconsistent with the national contingency plan."

132.     The response actions that the State has taken and will take to respond to the release of hazardous substances at the Site are not inconsistent with the "national contingency plan." See 40 C.F.R. Part 300.

133.     All Defendants are "persons" within the meaning of 42 U.S.C. § 9601(21).

134.     Crescent Group, Mavellia, and Auerbach directed, managed, and controlled the affairs of the Site and other facilities at the Site, including operations having to do with the leakage of hazardous waste and decisions about environmental compliance, and are thus current operators of the Site within the meaning of 42 U.S.C. § 9607(a)(1).

135.    Crescent Group currently owns the Site and thus is a current owner of the Site within the meaning of 42 U.S.C. § 9607(a)(1).

136.    The Crescent Individuals own Crescent Group, which has no separate corporate existence from the Crescent Individuals. At all relevant times, Crescent Group was severely undercapitalized, dominated, and controlled by the Crescent Individuals and failed to adhere to corporate formality when purchasing the Site and interacting with DEC.

137.    By transferring the Site from Wharton Pryce, an entity owned by Mavellia, to Crescent Group, for no consideration other than the assumption of the Site's liabilities, the Crescent Individuals sought to shield the assets of Wharton Pryce and St. James Crescent—and ultimately, themselves—from the liabilities of the Site.

138.    The Court should therefore pierce the Crescent Group's veil and hold the Crescent Individuals jointly and severally liable for the Crescent Group's liabilities.

139.    Under 42 U.S.C. § 9607(a), defendants Crescent Group and the Crescent Individuals are strictly, and jointly and severally, liable to the State for past response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site.

140.    Under 42 U.S.C. §§ 9607(a) and 9613(g), defendants Crescent Group and the Crescent Individuals are strictly, and jointly and severally, liable for future response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site.

## PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against defendants, upon the claims set forth above, and requests that this Court enter judgment against defendants, as follows:

1. Declaring defendants Crescent Group and the Crescent Individuals to be strictly, and jointly and severally, liable to the State under CERCLA for, and awarding to the State, all costs and expenses, including interest, attorneys' fees, and other costs of enforcement incurred by the State in responding to the release of hazardous substances at and from the Site and other facilities at the Site.

2. Declaring defendants Crescent Group and the Crescent Individuals to be strictly, and jointly and severally, liable to the State under CERCLA for all future response costs and expenses, including interest, attorneys' fees, and other costs of enforcement to be incurred by the State in responding to the release of hazardous substances at and from the Site and other facilities at the Site.

3. Piercing the corporate veil of Crescent Group, and awarding damages against the Crescent Individuals to compensate the State for Crescent Group's liability from ownership of the Site.

4. Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated: New York, New York
October 8, 2020

LETITIA JAMES
Attorney General of the State of New York
Attorney for Plaintiffs

By: /s/ Austin Thompson
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street
New York, New York 10005
(212) 416-8464
austin.thompson@ag.ny.gov